UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| GENEVA WALKER | CIVIL ACTION NO. 04-2310 |
|---|---|
| versus | JUDGE HICKS |
| | **REFERRED TO:** |
| COMMISSIONER OF THE SOCIAL | **MAGISTRATE JUDGE HORNSBY** |
| SECURITY ADMINISTRATION | |

# MEMORANDUM RULING

**Introduction**

Geneva Walker ("Plaintiff") applied for disability insurance benefits and Supplemental Security Income benefits based on an assertion of disability beginning March 25, 2000. Plaintiff was 53 years old at the time ALJ Jeannie McLean decided her case. Plaintiff has the equivalency of a high school education, plus two years of college credits. Her past work experience includes employment as a janitor, construction laborer, electronics assembler, general office clerk and hand packager.

The ALJ analyzed the claim pursuant to the five-step sequential analysis set forth in 20 C.F.R. § 404.1520 (governing claims for disability insurance benefits) and § 416.920 (parallel regulations governing claims for Supplemental Security Income) and described in Barnhart v. Thomas, 124 S.Ct. 376, 379-80 (2003). She found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date (step one) and that Plaintiff had a combination of impairments, including chronic headaches and depression that were severe

within the meaning of the regulations (step two), but that did not meet or equal a listing (step three).  Tr. 15-16.

The ALJ then reviewed the medical evidence and testimony and concluded that Plaintiff had the residual functional capacity ("RFC") to perform the physical demands of medium work, limited by an inability to perform work involving moderate concentration, persistence or pace.  She opined that Plaintiff was, therefore, capable of performing her past relevant work (step four) as a selector/packer/inspector or as an electronics assembler but, in an effort to give the claimant every benefit of the doubt, the ALJ conceded step four.  Tr. 18.

At step five, which asks whether Plaintiff has the RFC to perform other work, the ALJ looked to Medical-Vocational Guideline 203.21.  The rule could not be used to decide the case because of Plaintiff's non-exertional limitations, but the ALJ used it as a framework to indicate that Plaintiff was not disabled.  She also received testimony from a vocational expert ("VE") that a person with Plaintiff's RFC could perform the jobs of general office worker, stock/inventory clerk or cashier.  Accordingly, the ALJ denied benefits.  The Appeals Council denied review (Tr. 4), and Plaintiff filed this civil action seeking judicial review pursuant to 42 U.S.C. § 405(g).

**Issues on Appeal**

Plaintiff lists two errors in her brief.  The first is a general complaint that the ALJ lacked substantial evidence to support her decision.  The second issue challenges the finding

that there are jobs available in significant numbers that Plaintiff could perform and maintain. After the briefs were filed, both parties consented to have a magistrate judge decide the case, and this case was referred to the undersigned pursuant to a standing order of the district court and 28 U.S.C. § 636(c).

**Standard of Review; Substantial Evidence**

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards. Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990). "Substantial evidence is more than a scintilla and less than a preponderance. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). A finding of no substantial evidence is justified only if there are no credible evidentiary choices or medical findings which support the ALJ's determination. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).

**Medical Evidence**

Plaintiff was treated for a number of years by Dr. Roger Kelley, who worked in the neurology department at LSUMC. Plaintiff reported to him in March 1999 that she was averaging two severe headaches per month. The headaches included significant throbbing with a sense of severe malaise and nausea. Dr. Kelley found that Plaintiff had a combination of common migraine and tension headache with occasional classic migraine. He also found that she suffered from chronic depression that had not responded well to a number of

antidepressants that had been tried in the past. He changed her medications and recommended a return visit in three months. Tr. 118-19.

Plaintiff returned six months later and reported a definite improvement in both the frequency and severity of her headache problem. Dr. Kelley stated that there was a definite impact when her husband moved away and reduced stress in the family setting. Tr. 116-17. Plaintiff returned three months later and reported increasing stress, related to financial problems and family matters, that had worsened her emotional state and impacted her headache problem. Plaintiff reported having at least several severe migraine headaches per month and several tension-type headaches each week. She reported that she was nonetheless working in construction. Tr. 114-15.

Plaintiff reported in March 2000 that she was under increasing stress related to various problems. One of them was her son, who was too drunk to get out of the car and come in the clinic for his appointment. Plaintiff reported having three or four significant common migraines since her last visit three months earlier. Dr. Kelley wrote that the headache and depression problems were "situational in nature, as she is estranged from her husband, has financial problems, and has a son who has mild mental retardation, epilepsy and a recent drinking problem." Plaintiff reported that she was working construction six days a week. Tr. 112-13.

Dr. Kelley expressed concerns at the next visit, in June 2000, that Plaintiff was not complying with the medications he directed for her migraines. Plaintiff also advised that her

cardiologist had discharged her because she would not do what he said. Plaintiff reported three to four common migraine headaches per month, moderate to severe in nature, and recurrent tension headache with increased frequency related to stress over her son (who was then in a detox center). Plaintiff appeared tired but denied significant depression. Dr. Kelley noted that Plaintiff had been reluctant to take or had difficulty tolerating antidepressants that he prescribed in the past. Tr. 110-11.

Plaintiff reported in November 2000 that there had been a "definite improvement in her headache pattern," but she was not sure as to the reason. She said she would go two to three weeks without any headache, and the headaches that she did experience were not as severe as those she had earlier. Tr. 109.

Plaintiff returned in March 2001 and reported "some improvement" in her headache pattern, but she was still susceptible to common migraine and tension headache, with most of her recent headaches being tension in nature. She said she suffered an average of three or four headaches per month, with each lasting only a few hours. Plaintiff reported increasing stress related to a business that she had started making sandwiches for construction workers. (This was one year after Plaintiff's alleged onset date.) The business had done well until construction stopped at a new casino project. Tr. 107-08. Plaintiff reported in July 2001 that there had been "some improvement" in her headache pattern, but she had two severe headaches in recent months and one the previous week that was particularly severe. She believed the headaches were related to increasing tension and

nervousness over her job situation. Plaintiff reported that she had not been able to find a job, but Dr. Kelley questioned how aggressively Plaintiff was looking for work, considering her training as an electronics technician and experience as a nurses aid.  Tr. 104-05.

By November 2001, Plaintiff "appeared to be doing relatively well" and had not required any recent evaluation in an emergency room for migraines.  She had "reasonable control" over her headaches, but ongoing situational factors made the control less than optimal.  Tr. 102.  Medical records reflect emergency room visits on February 27, 2000 and May 7, 2001 for complaints of migraine headache.  Tr. 139-41 and 159-61.

Thomas Staats, Ph.D., a clinical neuropsychologist, conducted a consultative examination of Plaintiff in May 2002.  Plaintiff reported that her headaches had become problematic following an electrical shock that she received while reaching into a stove in 1994.  She complained of chronic pain for the last three or four years, stemming from a car accident where she fractured a vertebrae and caused a bulging disk. Dr. Staats observed that Plaintiff was not in acute distress, but she was unable to regulate her affect throughout the interview and teared up at one point as she discussed her son having an insulin overdose that put him in a vegetative state.  She reported sadness, fatigue and anxiety.  Her thinking was logical and coherent, and she was well oriented and able to carry on a conversation without difficulty.  Her concentration was marginal, persistence poor, and she overall interacted poorly on a one-on-one basis. Dr. Staats' diagnostic impression was psychological factors affecting a general medical condition (mixed headache syndrome), major depressive disorder,

and generalized anxiety disorder. His prognosis was "guarded from a purely psychological standpoint," and he opined that her psychological impairment could add to any physical impairments (such as headaches or pain) assessed on medical review. Tr. 162-63.

**Testimony**

Plaintiff testified that her headaches became worse after the electrical shock in 1994, which also required the installation of a pacemaker. She said her back problem began after her back was fractured in a 1998 car accident. Her legs sometimes go numb or experience pain, and she said she cannot sit for very long without being able to move around until the pain lets up. Tr. 210-11. Plaintiff lives alone in a trailer home. She makes her own breakfast and does some grocery shopping when she can, but her nephew takes care of her yard work. She has worked a number of different jobs over the years, some of which were fairly physical. One of her later jobs included serving on a cleaning crew on a construction job, removing construction debris and the like. She joined a laborer's union, but she quit after they told her that she was not able to do the work. Tr. 212-16. Plaintiff is able to drive and does so about twice a week. Tr. 218.

Beverly Prestonback offered VE testimony. The ALJ asked her a series of hypothetical questions that assumed a person with Plaintiff's age, education and work experience. The different questions assumed various levels of RFC. The VE opined that a person with the RFC ultimately found by the ALJ could perform all of Plaintiff's past relevant work except construction laborer, and she could perform the jobs of general office

clerk, stock/inventory clerk and cashier. Those jobs exist in significant numbers in the national and regional economies, and they are available in medium, light and sedentary classifications. Tr. 231-38.

**Issue 1: Substantial Evidence**

Plaintiff complains, generally, that the evidence does not support the ALJ's conclusion. That evidence, reviewed in detail above, shows that Plaintiff has a long history of serious migraines and other headaches, as well as depression, for which she has received regular treatment and a number of prescription medications. The frequency and severity of the headaches have varied. The ALJ certainly did not ignore the problems caused by the headaches and depression. To the contrary, she found that the headaches and depression resulted in a severe impairment that significantly limited Plaintiff's ability to work. She did not find, however, that the impairments precluded Plaintiff from performing all types of work.

There is often a degree of subjectivity inherent in the application of the regulations to particular facts, and reasonable minds can often differ as to the correct result. The RFC assessed by the ALJ in this case was reasonable and is supported by substantial evidence in the record. Furthermore, the existence of several light and sedentary jobs that the VE testified were available to a person with Plaintiff's vocational factors and non-exertional limitations makes the ALJ's finding of an RFC for medium work less critical. The Commissioner's decision survives scrutiny under the substantial evidence standard of review.

**Issue 2: Obtaining and Maintaining Work**

Plaintiff raises two issues under this heading. She first complains that the jobs identified by the VE were not likely available in the rural area where she lives. The regulations are not designed to award disability based on whether a particular claimant can actually find and be hired for a certain job in the place where she lives. Rather, the regulations deem a person not disabled if she retains the RFC to perform the functional demands and job duties of past relevant work or other work that exists in the national economy and exists in significant numbers in the regional economy. The ALJ may look to sources such as the VE who testified in this case to find the ordinary requirements of a job and whether the job is available in significant numbers in the relevant economy. The inability of a particular claimant to find that job in her neighborhood or community is not relevant. If that were not the rule, persons who live in isolated areas or areas of high unemployment would be disabled when a person suffering the same or greater limitations in a more urban or economically fortunate area would be denied benefits. The regulations specifically state that a person will be found not disabled if his RFC and vocational abilities make it possible for him to do work that exists in the national economy even if the claimant remains unemployed because of his inability to get work, lack of job openings, cyclical economic conditions, or lack of work in the claimant's local area. See 20 C.F.R. § 404.1566(a)-(c).

Plaintiff also complains that there is no way she could maintain a job eight hours a day, five days a week. Plaintiff's argument about maintaining work invokes the Fifth

Circuit's Singletary decision, which interpreted disability under the Act to apply to cases in which a person is capable of working for short periods but can not *maintain* a job because his impairment flares up too often. Singletary does not, however, require every decision by an ALJ include a separate finding regarding the claimant's ability to maintain a job. Frank v. Barnhart, 326 F.3d 618, 621 (5th Cir. 2003). An ALJ's finding that a claimant can perform a certain level of work necessarily includes a finding that she is able to perform at that level not just intermittently but eight hours a day, five days a week. A separate and express finding regarding maintaining work is required only when the claimant's ailment "waxes and wanes in its manifestation of disabling symptoms." Id. See also Dunbar v. Barnhart, 330 F.3d 670 (5th Cir. 2003).

The ALJ's basic decision with respect to disability was upheld above, and there is no indication in this record that a separate finding with regard to maintaining employment was required. Plaintiff's headache problems were not a constant issue and did present themselves on distinct occasions, but that characteristic of the impairment was readily apparent and obviously considered by the ALJ when she assessed Plaintiff's RFC. The Singletary decision addressed a person who could sometimes work for short periods of time but could never hold a job for more than "short spurt" because of recurrent mental health problems. Plaintiff's claimed condition is not analogous. The evidence indicates a likelihood that Plaintiff will, on occasion, suffer headaches that will cause her to miss a day or maybe two of work. That situation, which was obvious when the ALJ decided the case, does not necessarily render a

person disabled and does not require the Court to reverse the Commissioner's decision for lack of specific mention of the issue in the ALJ's written opinion.

For these reasons, a judgment will be entered affirming the Commissioner's decision to deny benefits.

THUS DONE AND SIGNED at Shreveport, Louisiana, this 28th day of November, 2005.

_____
MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE